**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICK DOYLE, DANIEL HOULIHAN, JOHN NOLAN, ROBERT OLSON, MICHAEL PADALINO, JOHN PIGOTT, EUSEBIO RAZO, VERONICA RODRIGUEZ, MICHAEL ROMAN, RICHARD SOTO, and CAROL WEINGARD, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: |
| vs | ) ) | COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND THE |
| THE CITY OF CHICAGO, and BRIAN THOMPSON, individually and in his capacity as a Unit Commander for the City of Chicago, | ) ) ) ) | SHAKMAN DECREE  **JURY DEMANDED** |
| Defendants. | ) ) | |

## JURISDICTION AND VENUE

1. In 1969, the City of Chicago was made subject of a federal lawsuit in the Northern District of Illinois entitled *Michael Shakman et al. vs. Democratic Organization of Cook County, et al.*, Case No. 69 C 2145. In order to resolve many of the issues involved in that case, in 1972 the City of Chicago and its then Mayor entered into a Consent Decree that prohibited the City of Chicago from "conditioning, basing or knowingly prejudicing of affecting any term or aspect of government employment with respect to one who is a government employee upon or because of any political reason or factor". This settlement, signed by a Judge, is often referred to as the "Shakman Decree".

2. In 1983 the Shakman Decree was expanded to include presently existing government employees as well as the City of Chicago's hiring practices. Under the 1983 Shakman Decree, it is unlawful to take political considerations into account in any employment actions, such as

recruitment, hiring, promotions, and transfers. The 1972 and 1983 decrees are often referred to as the "Shakman Decrees".

3. The District Court for the Northern District of Illinois has retained jurisdiction over the *Shakman* case. As part of its jurisdiction over the case, the Court is empowered to enforce the Shakman Decrees. The authority of the Court is placed in the hands of a federal Shakman Monitor.

4. This action also arises under the United States Constitution, the Civil Rights Act of 1871 (42 U.S.C. §1983), and 42 U.S.C. §1981 et seq., as amended.

5. This court has jurisdiction under and by virtue of this Court's retention of jurisdiction in *Michael Shakman et al. vs. Democratic Organization of Cook County, et al*. and 28 U.S.C. §§1343 and 1331.

6. Venue is founded in this judicial court upon 28 U.S.C. §1391 as the acts complained of arose in this district.

## PARTIES

7. At all times herein mentioned, Plaintiff Patrick Doyle ("Doyle") was and is a citizen of the United States, and was within the jurisdiction of this court.

8. At all times herein mentioned, Plaintiff Daniel Houlihan ("Houlihan") was and is a citizen of the United States, and was within the jurisdiction of this court.

9. At all times herein mentioned, Plaintiff John Nolan ("Nolan") was and is a citizen of the United States, and was within the jurisdiction of this court.

10. At all times herein mentioned, Plaintiff Robert Olson ("Olson") was and is a citizen of the United States, and was within the jurisdiction of this court.

11. At all times herein mentioned, Plaintiff Michael Padalino ("Padalino") was and is a citizen of the United States, and was within the jurisdiction of this court.

12. At all times herein mentioned, Plaintiff John Pigott ("Pigott") was and is a citizen of the United States, and was within the jurisdiction of this court.

13. At all times herein mentioned, Plaintiff Eusebio Razo ("Razo") was and is a citizen of the United States, and was within the jurisdiction of this court.

14. At all times herein mentioned, Plaintiff Veronica Rodriguez ("Rodriguez") was and is a citizen of the United States, and was within the jurisdiction of this court.

15. At all times herein mentioned, Plaintiff Michael Roman ("Roman") was and is a citizen of the United States, and was within the jurisdiction of this court.

16. At all times herein mentioned, Plaintiff Richard Soto ("Soto") was and is a citizen of the United States, and was within the jurisdiction of this court.

17. At all times herein mentioned, Plaintiff Carol Weingard ("Weingard") was and is a citizen of the United States, and was within the jurisdiction of this court.

(Doyle, Houlihan, Nolan, Olson, Padalino, Pigott, Razo, Rodriguez, Roman, Soto and Weingard are collectively referred to herein as "Plaintiffs")

18. The City of Chicago ("The City") is and was at all relevant times a municipal corporation organized and existing under the laws of the State of Illinois. At all relevant times, the City of Chicago maintained, managed, and/or operated the City of Chicago Police Department.

19. Defendant Brian Thompson ("Thompson") is and was at all relevant times the Unit Commander of the Security Specialists assigned to Unit 542. Plaintiffs sue Thompson

individually and in his official capacity as a Unit Commander for the City of Chicago. Thompson is an African-American.

## FACTUAL ALLEGATIONS

20. At all relevant times described herein, Plaintiffs were employed by the City as police officers assigned to work in the position of Security Specialist in Unit 542. Security Specialists are specially trained police officers assigned to provide security to the Mayor of the City of Chicago and other dignitaries in the City.

21. At all relevant times described herein, Plaintiffs performed their jobs according to the City's legitimate expectations.

22. Plaintiffs are non-African American.

23. Upon achieving the rank and title of Security Specialist the Plaintiffs received a promotion, pay raise and increased benefits. At all relevant times described herein, the City employed at least twenty-two (22) Security Specialists. Upon information and belief, at least four (4) out of the twenty-two (22) Security Specialists are African-Americans.

24. Pursuant to the Shakman Decrees it is unlawful for the City to take political considerations into account when recruiting, hiring, promoting or transferring Security Specialists.

25. On February 22, 2011, the City of Chicago held a mayoral election and elected Rahm Emanuel as Mayor.

26. In or around late April or early May, 2011, the City transferred several police officers who had not been previously assigned as Security Specialists to Mayor-Elect Emanuel and began treating them as Security Specialists. The City did not officially promote these officers, but rather allowed them to "act up" into the Security Specialist position.

27. Upon information and belief, each of the officers that the City allowed to "act up" as Security Specialists in late April or early May, 2011 had volunteered to work security for Rahm Emanuel when he was a mayoral candidate or was politically involved in Emanuel's campaign.

28. Because of the disfavored use of the "acting up" procedure, on August 7, 2007 the City of Chicago and Federal Shakman Monitor approved policy and guidelines for the use of the "acting up" procedure.

29. Under the August 7, 2007 Agreement, "acting up" is defined as where an employee is directed to, and does perform, or is held accountable for, substantially all of the responsibilities of a higher-level Shakman-protected title.

30. The policy and guidelines set forth on August 7, 2007 outlined a series of procedures, restrictions and limitations on the City's use of persons in an "acting up" capacity. These procedures, restrictions and limitations include, but are not limited to, the following:

   a) An individual is not allowed to "act up" for more than 520 hours in any calendar year, unless they have received an approved waiver from the Commissioner of the Department of Human Resources;

   b) If an employee will "act up" for less than 520 hours, the hiring official must:

   1) Identify all names and dates of seniority of employees who would be eligible to "act up" in the higher positions
   2) Provide an explanatory narrative stating how the hiring official selected the employees in the relevant pool
   3) Forward the relevant pool of employees to the Human Resources Department for approval
   4) Review eligible employees on the basis of seniority and fill the position based upon seniority
   5) If the most-senior employee is not selected, the hiring official must provide a written memorandum justifying his decision to his Department Head

c) A Shakman Certification "Employee Acting Up in a Higher Position" form must be prepared and sent along with the selection documentation to the Department of Human Resources. This form must also include the following:
1) An attachment from the department head attesting that no political considerations factored in the creation of the relevant pool of employees;
2) An attachment from the employee "acting up" each time he or she is selected to "act up"

d) All acting up into Shakman protected titles must be reported, regardless of the duration or whether it was paid.

31. The City failed to follow any of the procedures outlined in Paragraph 30 above when it allowed police officers not assigned as Security Specialists to "act up" into the Security Specialist position in late April and/or early May, 2011.

32. Upon information and belief, the officers "acting up" as Security Specialists in late April and/or early May, 2011 were not chosen from a relevant pool of employees consistent with the policy and guidelines for "acting up" set forth on August 7, 2007. The City also failed to prepare any documentation indicating that these officers were "acting up" at that time.

33. On or about May 13, 2011, the Defendants removed Plaintiffs Doyle, Houlihan, Padalino, Pigott, Razo, Rodriguez, Soto and Weingard from their Security Specialist position without just cause or any explanation.

34. When the Defendants removed Doyle, Houlihan, Padalino, Pigott, Razo, Rodriguez, Soto and Weingard from their Security Specialist positions they demoted them in title and rank and significantly lowered their pay and benefits.

35. When the Defendants removed Doyle, Houlihan, Padalino, Pigott, Razo, Rodriguez, Soto and Weingard from their Security Specialist positions on May 13, 2011, they did not remove or demote any African-American officers assigned as Security Specialists at that

time despite the fact that the non-African American Plaintiffs had greater seniority than the African-American Security Specialists.

36. When Plaintiff Pigott asked Thompson why he was being demoted and the African-American Security Specialists were not Thompson told Pigott, "The color of your skin is your sin".

37. On or about May 16, 2011, the Defendants transferred Doyle, Houlihan, Padalino, Pigott, Razo, Rodriguez, Soto and Weingard to the training academy for retraining. After the Plaintiffs attended retraining for several weeks, the City assigned the Plaintiffs to work as police officers in various police districts across the City of Chicago.

38. On or about May 16, 2011, Rahm Emanuel was sworn into office as Mayor of the City of Chicago.

39. On or about May 16, 2011, the City replaced Plaintiffs Doyle, Houlihan, Padalino, Pigott, Razo, Rodriguez, Soto and Weingard with police officers who had either volunteered for the Rahm Emanuel mayoral campaign or had a political connection to the Rahm Emanuel mayoral campaign. Plaintiffs Doyle, Houlihan, Padalino, Pigott, Razo, Rodriguez, Soto and Weingard did not have any connection to the Rahm Emanuel mayoral campaign and did not volunteer for Rahm Emanuel during the election.

40. The Defendants demoted the Plaintiffs and chose "replacement" Security Specialists based upon political factors.

41. On or about May 16, 2011, Plaintiffs Nolan, Olson and Roman retained their title and rank as Security Specialists but were detailed to work security for the former Mayor Richard M. Daley.

42. Plaintiffs Nolan, Olson and Roman worked on the former Mayor Daley's detail from on or about May 16, 2011 through September 15, 2011.

43. On or about September 15, 2011, the Defendants reassigned Plaintiffs Nolan, Olson and Roman to the training academy for retraining.

44. On or about October 21, 2011, the City issued Personnel Order No. 2011-128. Personnel Order No. 2011-128 officially removed Plaintiffs Nolan, Olson and Roman from their Security Specialist assignment. Olson was reassigned to work as a detective and Nolan and Roman were reassigned to police officer positions.

45. When the City reassigned Plaintiffs Nolan, Olson and Roman on October 21, 2011 it demoted them in title and rank and substantially lowered their pay and benefits.

46. Despite the fact that the City demoted Nolan from his Security Specialist position, Nolan remains on call to act as security for the former Mayor Daley on an as needed basis.

47. The Defendants demoted the each of the individual Plaintiffs from their rank of Security Specialists based upon the improper consideration of political factors. To wit, the Defendants replaced the Plaintiffs with newly promoted Security Specialists solely based upon the replacement officers' political involvement and association with Rahm Emanuel's mayoral campaign.

48. Upon information and belief, the Defendants did not solicit candidates, seek resumes, or conduct interviews for the Security Specialist position prior to or after the Plaintiffs' demotion. The City did not provide the Plaintiffs with any opportunity to retain their position as a Security Specialist prior to their demotion.

49. At all times mentioned herein, Plaintiffs were members of the Fraternal Order of Police, Chicago Lodge 7 (hereinafter "FOP 7"). The terms of Plaintiffs' employment with the

City of Chicago are outlined in collective bargaining agreement (hereinafter "Agreement") negotiated between FOP 7 and the City.

50. Section 23.10 of the Agreement is titled Non-Disciplinary Demotion. The Agreement indicates in this section that: "In the event of non-disciplinary demotions for economic reasons, the Employer shall select the most junior officer when the qualifications of the officers involved are equal. In determining qualifications, the Employer shall not be arbitrary and capricious, but shall consider training, education, experience, skills, ability, demeanor and performance."

51. The Defendants did not follow Section 23.10 of the Agreement when it demoted the Plaintiffs from their Security Specialist positions. The Defendants did not demote the Plaintiffs based upon their seniority levels or qualifications. In fact, the Plaintiffs had greater seniority and performance records than each of the African-American Security Specialists that the Defendants allowed to remain in that position in May, 2011.

52. At the time of Plaintiffs' demotion, Chicago Police Department Notice 07-47 outlined the procedures for selection and removal of Security Specialists.

53. D.N. 07-47(III)(F) and (H) indicate that political factors cannot be considered when selecting a Police Officer Assigned as Security Specialist and that all individuals selected as Security Specialists must sign the Shakman Certification form.

54. According to D.N. 07-47(IV)(A), Security Specialists may only be removed at the discretion of the Unit Commander, Government Security Detail, or on the recommendation of the unit commanding officer, Detached Services. Removals may also be made after consultation with the elective official or dignitary to whom the Security Specialist is assigned.

55. At the time of Plaintiffs' demotion, their Unit Commander was Brian Thompson.

56. The Unit Commander of the Security Specialists is a position exempt from the Shakman Decrees.

57. On June 24, 2011, the Northern District of Illinois approved the City's 2011 Hiring Plan under the Shakman Decrees. Chapter IX of the City's 2011 Hiring Plan added new language relating to Security Specialists that had not been included in prior City hiring plans. This language stated that, "[t]he employing department or official is not required to use any specific selection process in filling a [Security Specialist] position using this [hiring] process. The hiring department or official must not, however, take into account Political Reasons or Factors or other Improper considerations when evaluating or selecting a candidate."

58. In removing Security Specialists, the 2011 City Hiring Plan indicates that "Sworn employees selected under either of these processes may be removed from their Position and returned to their career service title at the discretion of the Superintendent of Police or in accordance with the applicable directive."

59. On or about June 24, 2011, the interim Superintendent of Police of the City of Chicago was Terry Hilliard. Terry Hilliard is an African-American.

60. On or about July 15, 2011, Gerry McCarthy, a Caucasian, was sworn in as Superintendent of Police of the City of Chicago.

61. The Defendants did not demote the Plaintiffs for any disciplinary reason. Plaintiffs were not admonished, counseled, or reprimanded during their tenure as Security Specialists.

62. At the time of Plaintiffs' demotion, the Defendants had knowledge of the Plaintiffs' race.

63. At the time of Plaintiffs' demotion, Defendants had knowledge of similarly situated African-American Security Specialists who had less seniority and qualifications but were treated more favorably than the Plaintiffs.

64. The Defendants treated similarly situated African-American Security Specialists that had less seniority and qualifications more favorably than the Plaintiffs when it did not demote the African-American Security Specialists on or about May 13, 2011.

65. Plaintiffs were demoted both because of political factors in violation of the Shakman Decrees and because of their race in violation of 42 U.S.C. §1981. The Defendants also violated the Plaintiffs' freedom to work for the City of Chicago free from political considerations.

66. In-between June, 2011 and December, 2011, Plaintiffs Olson, Padalino, Pigott, Rodriguez, Roman, and Soto each filed Accord Complaint Forms with the City of Chicago's Inspector General's Office complaining of violations of the Shakman Decrees. The Defendants' last discriminatory act in violation of the Shakman Decrees took place on October 21, 2011. Therefore, this Complaint is timely filed.

67. As a result of the aforesaid acts of the Defendants, Plaintiffs lost income and benefits in an amount to be proven at the time of trial. Plaintiffs claim such amounts as damages together with prejudgment interest as permitted by law.

68. The aforementioned acts of the Defendants were reckless, willful, wanton, malicious, oppressive, and in callous disregard and indifference to Plaintiffs. Thus Plaintiffs requests the assessment of punitive damages and/or liquidated damages against the Defendants in a sum as determined according to law and proof.

## COUNT I
## PLAINTIFFS AGAINST DEFENDANTS FOR
## VIOLATION OF THE SHAKMAN DECREES

69. Plaintiffs reallege and incorporate paragraphs one (1) through sixty-eight (68) as though fully set forth at this place.

70. The Defendants committed acts which constituted a violation of the Shakman Decrees in that Defendants hired new Security Specialists and demoted the Plaintiffs based upon improper political considerations, to wit: involvement with Rahm Emanuel's campaign for Mayor of the City of Chicago.

71. The Defendants conduct constituted a violation of the Shakman Decrees because they chose officers who were affiliated with the Rahm Emanuel Mayoral Campaign to "act up" as Security Specialist in late April and/or early May, 2011 and promoted the same officers to Security Specialist positions on or about May 16, 2011. The Defendants gave the Emanuel-affiliated officers preferential treatment over the Plaintiffs when it demoted the Plaintiffs in order to provide Emanuel-affiliated officers with Security Specialist assignments. The Defendants took these actions based upon political reasons or factors.

72. As a result of the Defendants' actions, Plaintiffs were demoted based on improper political considerations and suffered damages and such other injuries including the loss of money, position and rank.

## COUNT II
## PLAINTIFFS AGAINST DEFENDANTS FOR
## VIOLATION OF 42 U.S.C. §1983

73. Plaintiffs reallege and incorporate paragraphs one (1) through sixty-eight (68) as though fully set forth at this place.

74. Through the conduct of its agents, the Defendants deprived Plaintiffs of their right to enjoy their employment with the City of Chicago free from political interference.

75. The Defendants denied Plaintiffs their rights under the First and Fourteenth Amendment when they demoted the Plaintiffs based upon political factors, including but not limited to, their lack of affiliation with Rahm Emanuel, and replaced the Plaintiffs with officers who volunteered for, supported, or had political affiliations with Mayor Emanuel.

76. As a result of the Defendants' actions, Plaintiffs have suffered damages and other injuries including the loss of promotion, position and rank.

## COUNT III
## PLAINTIFFS AGAINST DEFENDANTS FOR RACE
## DISCRIMINATION IN VIOLATION OF 42 U.S.C. §1981

77. Plaintiffs reallege and incorporate paragraphs one (1) through sixty-eight (68) as though fully set forth at this place.

78. Plaintiffs are non-African American and within a protected category based upon their race.

79. At all material times, Plaintiffs performed their jobs according to the City's legitimate expectations.

80. Plaintiffs suffered a severe adverse employment action when they were demoted.

78. Plaintiffs, non-African Americans, were treated differently than similarly situated African-Americans when the Defendants demoted them from their Security Specialist positions. Defendants violated Plaintiffs' rights in violation of 42 U.S.C. §1981 when Defendants demoted Plaintiffs based on their race.

79. As a direct and proximate result of said unlawful employment practices and in disregard of the Plaintiffs' rights and sensibilities, Plaintiffs have suffered the indignity of

discrimination, the invasion of right to be free from discrimination and humiliation, which has manifested in physical and emotional distress and further has negatively impacted their future ability to support themselves, harmed their earning capacity, disrupted their personal lives, and caused loss of enjoyment of the ordinary pleasures of life.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by and through their attorneys, Ed Fox & Associates, request the following relief:

A.   That Plaintiffs be granted general and compensatory damages in an amount to be determined at trial;

B.   That Plaintiffs be granted punitive or liquidated damages in an amount to be determined at trial;

C.   That Plaintiffs be granted equitable relief including, but not limited to, reinstatement to their Security Specialist title, rank and pay rate;

D.   That the Court grant to Plaintiffs their reasonably incurred attorneys' fees, costs, litigation expenses, and pre-judgment interest; and

E.   That the Court grant such other and further relief as the Court may deem just or equitable.

BY:   s/Jonathan R. Ksiazek
        Jonathan R. Ksiazek
        Edward M. Fox
        ED FOX & ASSOCIATES
        Attorneys for Plaintiffs
        300 West Adams, Suite 330
        Chicago, Illinois 60606
        (312) 345-8877
        jksiazek@efox-law.com

**PLAINTIFFS HEREBY REQUEST A TRIAL BY JURY**

                                BY:    s/Jonathan R. Ksiazek
                                                 Jonathan R. Ksiazek
                                                 Edward M. Fox
                                                 ED FOX & ASSOCIATES
                                                 Attorneys for Plaintiffs
                                                 300 West Adams, Suite 330
                                                 Chicago, Illinois 60606
                                                 (312) 345-8877
                                                 jksiazek@efox-law.com