IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK DOYLE, DANIEL
HOULIHAN, JOHN NOLAN, ROBERT
OLSON, MICHAEL PADALINIO,
JOHN PIGOTT, EUSEBIO RAZO,
VERONICA RODRIGUEZ, MICHAEL
ROMAN, RICHARD SOTO, and
CAROL WEINGART,

          Plaintiffs,

    v.

THE CITY OF CHICAGO, BRIAN
THOMPSON, Individually, TERRY
HILLARD, Individually, RAHM
EMANUEL, Individually,
MICHAEL FAULMAN,
Individually, and GARRY
McCARTHY, Individually, JAMES
JACKSON, Individually
BEATRICE CUELLO,
Individually, and EUGENE
WILLIAMS, Individually,

          Defendants.

Case No. 12 C 6377

Judge Harry D. Leinenweber

**REDACTED MEMORANDUM OPINION AND ORDER**

**I.   BACKGROUND**

The eleven Plaintiffs are current or former Chicago police officers who at one time were assigned to the Security Specialist position. As Security Specialists they provided protection to former Mayor Richard M. Daley, as well as to visiting dignitaries. Unlike other police officers below the

rank of sergeant, Security Specialists receive base pay equivalent to sergeant's pay. The Defendants are Brian Thompson, Unit Commander of the Security Specialists ("Thompson"), Terry Hillard ("Hillard"), interim Superintendent of the Chicago Police Department ("CPD"), Rahm Emanuel, Mayor of Chicago ("Mayor Emanuel"), Michael Faulman, Administrator to the Mayor ("Faulman"), Garry McCarthy, Superintendent of Police ("McCarthy"), James Jackson, First Deputy CPD ("Jackson"), Beatrice Cuelo, Assistant Superintendent of Administration CPD ("Cuelo"), and Eugene Williams, Chief of Patrol CPD ("Williams").

In September 2010, Mayor Daley announced that he did not intend to seek re-election. On February 22, 2011, Mayor Emanuel was elected Mayor. Daley's term ended on May 16, 2011, the day Mayor Emanuel was to be sworn in. At the time of the election, the Superintendent of the CPD was Jody Weis ("Weis"). Weis decided to retire and his last day was March 1, 2011. To fill the vacancy during the period between Weis' leaving and Emanuel's swearing in, Mayor Daley appointed Hillard as Interim Superintendent. Hillard was a 35-year veteran of the CPD and was Superintendent from 1998 until 2003 when he retired. He had vast experience in providing security as he had been a Security Specialist providing protection to Mayors Jane Byrne and Harold

Washington. Moreover, he had no affiliation with Emanuel and was not involved in his mayoral campaign.

At the time Mayor Daley left office, his security detail consisted of 21 Security Specialists and two commanders. The establishment of the security detail for Emanuel was given to Hillard. He met with Emanuel on three occasions and was told that "he wanted as small a detail as possible and one that reflected the diversity of the city." Hillard choose Thompson to be the Commander of Emanuel's security detail because he had been commander of Daley's detail since 2000.

During Emanuel's campaign for Mayor, several CPD officers volunteered to provide security and to perform other tasks in aid of his campaign. These included Raymond Hamilton, Hakki Curkan, Mark Rebecchi, Mark Mejia, Paul Currincione, and Francisco Gonzalez (Collectively, the "Emanuel Volunteers"). On February 22, shortly after Emanuel's election, the CPD made the decision to provide Emanuel with a security detail until he was sworn in. Apparently Faulman made a request or suggestion that the 6 volunteers be included on the interim detail which was done. During the period prior to the swearing in, Hillard put together Emanuel's final security detail. It consisted of ▓ officers in addition to Thompson and included ▓ members of Daley's detail recommended by Thompson, ▓ officers that had

provided protection to Emanuel during the transition period and ▮ officers recommended by other CPD command staff, which included Defendants Cuelo, Jackson and Williams. The total was ▮ fewer that had been provided to Mayor Daley.

After Emanuel was sworn in as Mayor, the CPD, as a courtesy decided to provide former Mayor Daley with a small protective detail. A Daley assistant requested Plaintiffs Nolan, Olson, Roman and Quinn continue to protect Daley. These officers thus retained the Security Specialist title and pay.

Hillard did not make the final selections for Emanuel's security detail until approximately one week before the swearing in. Cuelo was assigned the job of performing the paper work. On May 13, 2011, Cuelo called the Plaintiffs, the nine officers (the "May 13 Plaintiffs") who had been assigned to Daley's mayoral detail but who were not being re-assigned to Emanuel's detail, and instructed them to report to the CPD Training Academy on the following Monday, May 16 for retraining and reassignment. These reassignments were memorialized in CPD Personnel Orders issued by new Superintendent McCarthy on June 21, 2011. The four Security Specialists including three Plaintiffs assigned to Daley retained their position until McCarthy decided to terminate the Daley detail as of September 15, 2011. On that date the four (the "September 15

Plaintiffs") were instructed to go to the Academy for retraining. This action was memorialized by McCarthy with a Personnel Order dated October 21, 2011.

The Plaintiffs, all of whom are members of the Fraternal Order of Police ("FOP"), filed grievances pursuant to the Collective Bargaining Agreement. The May 16 Plaintiffs filed on or before August 12, 2011, and the September 15 Plaintiffs filed on or before October 9, 2011. Between June 2011 and December 2011, Plaintiffs Olson, Padalino, Pigott, Rodriguez, Roman and Soto filed Accord Complaint forms with the Office of the Inspector General complaining that their re-assignments violated the *Shakman* Decree. The Plaintiffs all filed their complaints with the Illinois Department of Human Rights and Equal Opportunity on August 16, 2012 and filed this Complaint on August 13, 2012. The Complaint, now in its fifth version, consists of five counts: Count I against the City of Chicago alleging violation of the *Shakman* Decree; Count II against the individual Defendants alleging Section 1983 First Amendment violations; Count III against Hillard, and all Defendants except Faulman, alleging Section 1983 Equal protection violations; Count IV against all Defendants except Faulman alleging Section 1981 race discrimination; and Count V against the City of

Chicago alleging Title VII violations. The Defendants have moved for summary judgment on all counts.

Before he left office Mayor Daley's ▮ officer security detail was composed of ▮ white males, ▮ white female, ▮ black males, ▮ Hispanic males and ▮ Hispanic female. The ▮▮▮▮▮ officers assigned to Mayor Emanuel's detail consisted of ▮ white males, ▮ black males, ▮ Hispanic males, and ▮ Hispanic female. The ▮▮▮ assigned to Mayor Daley consisted of ▮ white males.

## II.  **DISCUSSION**

### A.  **The Political Affiliation - Counts I and II**

Count I alleges that the individual Defendants violated the Plaintiffs' right to work free from political discrimination, and Count II alleges that in doing so the City violated the *Shakman* Decrees.

The individual Defendants move, with the exception of Thompson and Hillard, for summary judgment on Count I on the basis that they did not have personal involvement in the alleged constitutional violation. The personal involvement of these other Defendants, according to Plaintiffs, is that they made recommendations to Thompson and Hillard that would involve the hiring of the Emanuel volunteers. However, the decision as to whom to retain and whom to reassign was left clearly in the hands of Thompson and Hillard. The alleged personal involvement

of Emanuel and Faulman consisted of selection of the Emanuel volunteers as his mayor-elect security detail and Faulman's recommendation of the Emanuel volunteers with Emanuel's apparent knowledge for his mayoral detail. The Court has found no cases, and the parties have suggested none, in which Section 1983 liability could rest on the mere act of making a recommendation as to some employment decision. If making a recommendation at the request of an appointing officer will subject that person to Section 1983 liability, individuals would be reluctant to make a recommendation. Cuelo and Jackson merely did the administrative work in making the appointments. Williams provided a list of names at Hillard's request. McCarthy was not even employed at the time the decisions were made and his involvement only consisted of making the decisions final through issuance of appropriate personnel orders.

There is no basis to conclude that any of these administrative acts were taken for illegal reasons. The Plaintiffs did not make formal complaints until well after the decisions were implemented. Plaintiffs cite *Hildbrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1038 (7th Cir. 2003) in support of their position that these officials had the requisite personal involvement. However, this case actually supports the Defendants' positions. That case involved an

alleged discriminatory pay raise granted to a female employee that was smaller than what was given to her comparable male colleagues. Section 1983 liability was sought against the supervisor of the decision maker and also against his supervisor. The evidence disclosed that the supervisor had actively participated in the meeting at which the raises were approved, gave requested comments as to the propriety of the raises, and made suggestions as to changes in the raises. The supervisor's supervisor, on the other hand, was held not to be liable because his involvement consisted of attendance and participation at the meeting at which the raises were discussed. Here the decisions as to promotion and demotion were solely made by Hillard on Thompson's recommendation. The other defendants either responded to requests for recommendations or merely performed an administerial, non-judgmental act in order to carry out Hillard's decisions.

Hillard and Thompson were the two Defendants who made the decisions as to who was to be kept and who was to be reassigned. The evidence against them is that they made the decisions to reassign the Plaintiffs with the knowledge that their replacements were both supporters of Emanuel and were requested by Faulman. Thus, arguably the Plaintiffs have set forth sufficient evidence to show that political considerations were a

motivating factor in the decisions to reassign.  *See, Greene v. Cook County Sheriff's Office,* 2015 WL 514660 at *16 (N.D. Ill. Feb. 4, 2015).  However, this does not end the inquiry because the Defendants claim to be entitled to qualified immunity on the question of whether the Security Specialists are confidential employees and thus exempt from Section 1983 First Amendment liability.  Here, *Greene,* decided four years after the reassignments occurred in this case, came down with the conclusion that the case law was not firmly established at the time the political reassignments occurred in that case.  Judge Pallmeyer in that case also pointed out that neither a job description nor a Consent Decree is dispositive on the issue of clear establishment.  While both can provide a safe harbor, they are not "straitjackets."  *Riley v. Blagojevich,* 425 F3d 357, 365 (7th Cir. 2005).  This also finds support from the United States Supreme Court in *Davis v. Scherer,* 468 U.S. 183, 193 (1984).  It is a constitutional violation that must be clearly established, not a clear violation of a statutory or administrative provision.

From an objective standpoint it is not clear either that the job of Security Specialist, whose main duty is to protect the mayor and his family, is non-confidential.  The duties involve close scrutiny of the mayor and his family which could

- 9 -

involve observations of the family in intimate circumstances. They also involve driving the mayor with his close aides when they may well be discussing important and highly sensitive subjects. They also involve providing physical safety and satisfying emotional concerns that might arise from the fact that Emanuel is the first Jewish mayor of Chicago and had been Chief of Staff of the first African-American president of the United States. It is therefore not unreasonable for the mayor to wish to have the right to select is own security staff. Therefore, the Court finds that Hillard and Thompson are entitled to qualified immunity.

### 1. *The Claims of Nolan, Roman and Olson*

These three Plaintiffs were dealt with differently from the nine other Plaintiffs. Instead of being reassigned to retraining at the police academy, they were placed on the detail protecting Mayor Daley after his term concluded at his request. Thus, they were not reassigned in favor of the new replacements, and they kept their same position with the same benefits as before. Therefore they were not subjected to an adverse employment action. They have made no effort to establish that there was anything political in this decision since they kept the same job with the same duties as before, only not with the new mayor. They lost their employment as

Security Specialists because Superintendent McCarthy, who had nothing to do with the decision to keep the four on Mayor Daley's detail, decided that Mayor Daley no longer needed a security detail.

The Plaintiffs do not attempt to make the case that eliminating Mayor Daley's security detail was based on illegal political reasons.

### 2. *Shakman Claim Against the City of Chicago*

First, the Plaintiffs Doyle, Houlihan, Nolan, Razo and Weingart acknowledge that the City is entitled to summary judgment on their *Shakman* claims because they did not timely file Accord Complaints with the City Office of Inspector General, or a timely Complaint in federal court as required by the Consent Decree. The Court finds that for the reasons stated concerning the First Amendment case of Plaintiffs Roman and Olson, the City is likewise entitled to summary judgment on their *Shakman* claims. This leaves Plaintiffs, Padalino, Pigott, Rodriguez and Soto with potentially viable *Shakman* claims.

The City of Chicago argues that neither Hillard nor Thompson knew the political affiliation of the Mayor Emanuel appointees, but did know that they had experience protecting Emanuel. However, the evidence showed that both Hillard and Thompson sought recommendations from Mayor Emanuel and Faulman.

The fact that the Mayor Emanuel volunteers were recommended and appointed is some evidence that politics may have played a role. The Security Specialist position was not on the *Shakman* exempt list. So, the City should have conducted an investigation to ensure itself that politics did not play a role prior to executing the *Shakman* certificates which it arguably did not do. Furthermore, Hillard made the decision to transition the Mayor Emanuel volunteers without reviewing their job performance, meeting with them, or having been told either that they were or were not doing a good job. Further, he testified that he did not have any belief that they were better or worse than those demoted. Based on the entire record, the Court believes that there is sufficient evidence to make a triable issue on the *Shakman* claims of Plaintiffs Padalino, Pigott, Rodriguez, and Soto. The Motion for Summary Judgment is denied as to these Plaintiffs, but granted as to Plaintiffs Doyle, Houlihan, Nolan, Olson, Razo, Roman, and Weingart.

### B. Plaintiffs' Title VII Claims

The City of Chicago contends that the Title VII claims of all of the Plaintiffs are time barred. A Title VII claim is timely if a charge is filed with the EEC within the 300 day time period after the discrete discriminatory act occurred. There are different dates to consider because there are two groups of

Plaintiffs: the first group is those who were told they were to be demoted on May 16, 2011, and the second group is those who were told they were being demoted on September 15, 2011. All Plaintiffs filed charges with the EEC on August 16, 2012 so none were filed within the 300 day time period. Plaintiffs have two different responses to this contention. First, as to the September 15 Plaintiffs, they point out that Superintendent McCarthy did not issue the personnel order until October 21, 2011, thus the demotion did not become irrevocable until that date which made their charges timely. They cite *Flannery v. Recording Industry Ass'n of America,* 354 F.3d 632, 637 (7th Cir. 2004). In that case, the court held that the date "must be a final, ultimate, non-tentative decision" to invoke the adverse employment decision.

In *Flannery,* the court explained that where an employer communicates a willingness to consider changing a final decision, "as through an appeal process" the decision would not be final until that process ran its course. However, there was no appeal process here to run its course. There was a grievance procedure that was, in fact, utilized by Plaintiffs, but the Supreme Court has held that the pending of a grievance "by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made." *Delaware State*

*College v. Ricks,* 101 S.Ct. 498, 506 (1980). Therefore, summary judgment on the Title VII claims of the September 15 Plaintiffs is granted in favor of the City of Chicago.

Second, because the May 16 Plaintiffs were demoted pursuant to McCarthy's personnel issued on June 21, 2011, they acknowledge that their charges were untimely under either date. They therefore claim that they are victims of continuing violations which makes their notices timely. However there was nothing "continuing" about the employment action here. They were demoted and sent for retraining as of May 16 (or as they argue June 21). There is nothing continuing about it. They were replaced by the Mayor Emanuel volunteers whose races they could easily have determined as well as the races of those security specialists that were retained. Their cases do not involve piecemeal discriminatory acts that could mislead a plaintiff in believing that he was being treated fairly. Accordingly, the Court grants the Motions for Summary Judgment of the City of Chicago on the untimely Title VII claims of the May 16 Plaintiffs.

### C. Section 1981 and 1983 Race Discrimination - Counts III and IV

Mayor Daley's detail while he was mayor consisted of ■ officers: ■ Caucasian, ■ African-Americans and ■ Hispanics.

The combined membership of Mayor Daley's and Mayor Emanuel's details after Hillard's appointments consisted of ■ officers: ■ Caucasians, ■ African-Americans, and ■ Hispanics. However, all ■ of Mayor Daley's detail were Caucasian, which means that Mayor Emanuel's detail was ■ Caucasians, ■ African-Americans, and ■ Hispanics. Plaintiffs make their major efforts on the direct method of proof. Their mosaic starts with Mayor Emanuel's request to Hillard that the detail be diverse. Apparently, in order to insure this result, Hillard asked Thompson to list the races of those he was recommending to be appointed to Mayor Emanuel's detail. None of the Plaintiffs, all Caucasians, were recommended by Thompson for appointment which was the main reason they weren't selected. Hillard further admitted that he considered race in making the appointments but claims that this was not the sole factor. He re-appointed Thompson to be the detail's captain and one of the reasons for his re-appointment was his race - African-American. Allegedly, according to Plaintiff Pigott, when asked why he was passed over in favor of an African-American, Thompson told him "John, the color of your skin is your sin."

The Plaintiffs also claim that they have established the claim by indirect proof. Defendants respond with a laundry list of shortcomings of each of the Plaintiffs. However, each of the

Plaintiffs had served as Security Specialists for lengthy periods of time and each had received "exceeds expectations" on performance reviews. Thus, there are questions of fact on the indirect method of proof also. Since the Court has previously held that only Thompson and Hillard were involved in the appointing process, summary judgment is granted in favor of all Defendants save Thompson and Hillard. Summary judgment is denied as to Thompson and Hillard.

However, since Nolan, Olson and Roman were not subject to an adverse action based on race, summary judgment in favor of the Defendants is granted as to their claims.

### III. CONCLUSION

For the reasons stated herein, the Court rules as follows:

1. Summary judgment is granted in favor of Defendants Emanuel, Cuelo, Faulman, Jackson, McCarthy and Williams on all Counts;

2. Summary judgment is granted in favor of Hillard and Thompson on Count II;

3. Summary judgment is granted in favor of the City of Chicago on the claims of Doyle, Houlihan, Nolan, Razo, Weingart, Nolan, Olson Razo, Roman, and Soto on Count I;

4. Summary Judgment is denied as to Padalino, Pigott, Rodriguez, and Soto on Count I;

5. Summary judgment is granted in favor of all Defendants save Hillard and Thompson on Count IIIs and IV;

6. Summary judgment is granted in favor of Hillard and Thompson against Nolan, Olson and Roman on Counts III and IV;

7. Summary judgment is denied against Doyle, Houlihan, Padalino, Pigott, Razo, Rodriguez, Soto and Weingart on Counts III and IV; and

8. Summary judgment is granted in favor of the City of Chicago against all Plaintiffs on Count V.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　United States District Court

Dated: September 30, 2015