```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION
```

| | |
|---|---|
| **MICHAEL PADALINO, JOHN PIGOTT, VERONICA RODRIGUEZ, and RICHARD SOTO,** | Case No. 12 C 6377 |
| Plaintiffs, | Judge Harry D. Leinenweber |
| v. | |
| **THE CITY OF CHICAGO,** | |
| Defendant. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case started out with eleven disgruntled current or former Chicago police officers who at one time had been assigned to the Security Specialist Position to provide protection to Former Mayor Richard M. Daley. As Security Specialists, the eleven, who held the rank of patrol officer, received pay equivalent to that of a sergeant. After the election of Mayor Rahm Emanuel, they were reassigned to their previous position of patrol officer with corresponding reduced pay. By the time the case was before the Court on its fifth amendment, the Plaintiffs were pleading five separate counts: Count I against the City of Chicago alleging violation of the Shakman Decree; Count II against the Individual Defendants alleging Section 1983 First Amendment violations; Count III against the Individual

Defendants alleging Section 1983 Equal Protection violations; Count IV against the Individual Defendants alleging Section 1981 race discrimination; and Count V against the City of Chicago alleging Title VII violations. The Defendants, who included Interim Superintendent Terry Hillard and Commander Brian Thompson (who was appointed by Hillard to be Commander of Mayor Emanuel's future security detail) all moved for summary judgment. The Court granted the Motions with the exception of Count I, the Shakman violations against the City of Chicago, and Counts III and IV, the Section 1983 and Section 1981 Equal Protection violations, against Hillard and Thompson. With respect to Count I, the Court dismissed all Plaintiffs other than Padalino, Pigott, Rodriguez, and Soto on statute of limitations grounds. The Court also dismissed all Defendants other than Hillard and Thompson on Counts III and IV. Counts III and IV proceeded to trial on June 13th before a jury which found in favor of Hillard and Thompson and against all Plaintiffs. Count I – the Shakman claim - proceeded to a bench trial after the jury portion concluded. The Court now renders its decision on Count I, finding in favor of the City of Chicago and against the Plaintiffs.

In 1972, Cook County entered into a consent decree prohibiting it from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental

- 2 -

employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." *See, O'Sullivan v. City of Chicago,* 396 F.3d 843, 848 (7th Cir. 2005) (providing history of Shakman litigation). A plaintiff alleging a violation of the Shakman Decree (the "Shakman Decree") "has the burden of proof by clear and convincing evidence." *Shakman v. Democratic Org. of Cook County,* No. 69-2145, 2009 WL 855633, at *2 (N.D. Ill March 30, 2009). Similar to a Section 1983 First Amendment case, once a plaintiff demonstrates that a term of his employment was prejudiced by a political reason or factor, the burden shifts to the City to show it would have made the same decision notwithstanding the political reason. *Shanahan v. City of Chicago,* 82 F.3d 776, 780 (7th Cir. 1996). Of course the Shakman Decree does not prohibit consideration of political affiliation for certain positions deemed to be policy making or in which political affiliation is a justifiable consideration for the effective performance of the public office involved. *Soderbeck v. Burnett County,* 752 F.2d 285 (7th Cir. 1985). The Shakman Decree further makes clear that "[t]he mere fact that a person worked for a political campaign for elective office does not prohibit consideration of a recommendation related to that person insofar as the basis for that recommendation relates to the person's relevant work experience." (Def. Ex. 74, p. 6-7.)

Here Plaintiffs contend that they were removed from the position of Security Specialist because the City favored fellow police officers, Gonzalez, Cirrincione, Gurkan, Mejia, and Rebecchi, all of whom had volunteered to drive during Mayor Emanuel's campaign for mayor. Thus, they contend the Shakman Decree was violated because the City favored the campaign volunteers over the Plaintiffs who did not volunteer in Emanuel's campaign. The City denies any political favoritism and contends that the appointing officers (Hillard and Thompson) did not know the political affiliation of either group and further that the officers were ultimately appointed because they had excellent work credentials, and had experience providing Mayor Emanuel with security services which were extremely difficult and sensitive.

## FINDINGS OF FACT

The Court starts with a little background history. In September 2010, Mayor Daley announced that he did not intend to seek re-election at the 2011 primary and general election. Rahm Emanuel, who had recently been Chief of Staff for President Obama, announced his intention to seek the office. On February 22, 2011, Mayor Emanuel was elected. Mayor Daley's term ended on May 16, 2011, on which date Mayor Emanuel was sworn in. On the date of the election, the Superintendent of Police was Jody Weis ("Weis"). Weis decided to retire as of

March 1, 2011. Mayor Daley appointed Terry Hillard ("Hillard"), a former Superintendent and a 35-year veteran of the police department, as Interim Superintendent who was to hold that office until Mayor Emanuel was sworn in.

Prior to leaving office Mayor Daley had a security detail consisting of 21 security specialists and two commanders. Hillard was given the duty to create a security detail for Mayor Emanuel. He met three times with Mayor Emanuel and was told that Emanuel wanted "a bare bones" detail that was as diverse as the City. Hillard found that what the Mayor wanted was not in the cards, because in his view, the job of security detail for Emanuel was much more difficult than it was for Mayor Daley. Emanuel was a "breaker," meaning that he had a history of eluding his security detail while in Washington, DC. His immediate family was younger and more numerous than Daley's, and Emanuel was younger and physically more active than Daley. In any event, Hillard, after consulting with a member of the Secret Service who was familiar with Emanuel, settled on creating a detail consisting of sixteen officers and one Commander, Brian Thompson. Thompson had been one of the commanders of Daley's detail, was well known to Hillard, and was highly respected by him.

During Mayor Emanuel's campaign, a number of Chicago police officers volunteered to assist him in performing driving duties.

- 5 -

In addition, a large number of non-police officers volunteered, a total of between 15 and 20. Most of the work done by the volunteers was driving Emanuel and his campaign aides to and from campaign events. The days were long and consisted of attending many campaign events throughout the City, and it was important to know the best way to get there and, most important, not get lost. One of the volunteers was a Chicago police officer by the name of Hakki Gurkan ("Gurkan"), who was well known to Emanuel because he had worked for Emanuel while he was a Congressman and had been a constituent. Gurkan was instrumental in obtaining several volunteers from the Chicago Police Department, including Rebecchi, Cirrincione, and Mejia.

On the day of the election, Mayor Daley's staff, including Chief of Staff Orozco and an aide, Daniel Gibbons, met and discussed the need to supply Emanuel with a security detail once he became, as expected, Mayor Elect. There was some disagreement and confusion about who was asked to supply names as to who should be appointed for security purposes during the period between the election and the date the Mayor was to take office. There appeared to be no suggestion that any of Mayor Daley's security team be reassigned to Emanuel's presumably because they were still protecting Mayor Daley and would do so until the end of his term in May. In any event, Michael Faulman ("Faulman"), Emanuel's aide, acknowledged that he sent a

proposed list of volunteers to Gibbons. Faulman stated that the names he forwarded were the best of the volunteers, *i.e.,* ones that had a history of not getting lost. Gibbons in turn sent the list to Orozco, who in turn sent it to Weis, who then instructed his Chief of Staff, Michael Master, "to make it happen." Accordingly, Weis officially detailed Gurkan, Rebecchi, Cirrincione, Hamilton, Smith and Mejia to Unit 543 to provide security to Emanuel during the interim period. Unit 543 was a position that provided security on an *ad hoc* basis to protect, for example, visiting dignitaries. Unlike members of Unit 542, which consisted of Security Specialists for the protection of the Mayor, the members of Unit 543 received no increase in pay.

As the inauguration date approached, Superintendent Hillard appointed Thompson to be Commander of Emanuel's mayoral security detail and asked him to recommend the members of Mayor Daley's security staff who he felt should be transferred to Emanuel's mayoral detail. Thompson recommended 8 security specialists from Daley's security staff for transfer (none of which were the Plaintiffs), and several more were recommended to Hillard by Assistant Superintendents Cuello, Jackson, and Williams. All of those recommended were appointed by Hillard. In addition, the five members of Emanuel's interim security staff were appointed by Hillard. Hillard's reasoning was that it was the right thing

to do to bring over people who had worked with Emanuel, knew his family's characteristics and thus could "intermingle" with the transfers from Daley's staff and provide needed information to them. Hillard's reasoning was supported at trial by the testimony of Donald O'Neill ("O'Neill"), Director of Human Resources of the Police Department, who testified that the experience gained by the volunteers in serving Emanuel was relevant work experience that could properly be considered by the appointing official. Hillard further reasoned that if any of the appointees "didn't work out" they could be transferred back to patrolman status. There is no actual evidence that Hillard made any of the appointments for political reasons. He testified that he made the appointments based solely on Thompson's recommendations and on his belief that, since Thompson would be working with them as their new Commander, it made sense to accept his recommendations. Moreover the Court can think of no overarching reason for Hillard to play political gamesmanship at this state of his career. He did not know Emanuel. He did not know any of the volunteers. He was to be the Interim Superintendent only for the transition period. It is also evident that the transition period was undoubtedly a hectic one with a lot going on. Certainly the makeup of the future mayor's security team would not be the most important item on anyone's plate.

Plaintiffs argue that when Hillard selected the officers of the mayoral security detail and detailed them to Unit 542 on May 16, 2011, they were then performing substantially all of the duties of the Security Specialist and were receiving D3 (sergeant's) pay. Thus, they were "acting up" under the terms of the City's hiring plan. However, they were not officially assigned to the position of security specialist until December 2011, which was well over the limit of 90 days allowed by the Shakman Decree. The evidence was that Thompson, on August 9, 2011, officially assigned them to the position of Security Specialist. However, one of the officers assigned, Paul Cirrincione, was removed from the detail for cause, thus derailing the paperwork process. The officers were ultimately not assigned until December 2011, which was clearly in excess of 90 days. Plaintiffs do not contend that the resultant delay from August to December occurred for a political reason. It would be hard to argue that it was. Either the appointments were legal or they were not as of August 9, 2011. No political benefit could be gained by causing a delay. As of August 9, 2011, the officers had been acting as Security Specialists for 85 days, which was within the permitted 90 days under the hiring plan.

Plaintiffs further argue that the City violated the Shakman Decree because Hillard did not execute Hire Certificates when he

- 9 -

detailed the volunteers to Unit 542 in February, 2011. According to O'Neill, such certificates, at least for the Security Specialist position, were not required to be executed until there were actual appointments, which did not occur until August 2011. Plaintiffs also argue that neither Hillard nor Thompson made the required investigation into whether politics was involved in the appointments, although by executing the certificates they attested that they had done so. The City takes the position that since Thompson was the sole decision maker in the appointments and since he professed that he did not take politics into consideration, he did not need to conduct any further inquiry. Although it reasonably can be argued that the Decree was violated by failing to conduct an inquiry, nevertheless the issue in federal court is whether the First Amendment rights of the Plaintiffs were violated by the appointment of the volunteers and the plaintiffs' subsequent demotions. *See, Shanahan v. City of Chicago,* 82 F.3d 776, 780 (7th Cir. 1996). Failure to conduct an investigation into political influences does not equate to a finding that political influences occurred. It is still incumbent upon Plaintiffs to prove their case. Further, Section 1983 and the Shakman Decree protect plaintiffs from constitutional violations and not from violations of state laws, departmental regulations, and practices. To the extent that Plaintiffs have proved minor

violations of some of the Decree's minutia does not prove that political considerations prevailed. *Thompson v. City of Chicago,* 472 F.3d 444, 454-5 (7th Cir. 2006) ("Section 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations and . . . practices.")

One final point: it was the police officers who volunteered to drive for the campaign. There was no evidence submitted that either Emanuel or any of his political aides actively solicited the volunteers or promised them any special consideration or favors based on their volunteerism. Certainly the motives of the volunteers must have included the hope that the experience gained and the contacts made would be helpful in the future and might lead to the appointment as a Security Specialist or some other benefit. Volunteering to gain experience is not materially different from an employee who attains specialized education with the hope that such knowledge gained would stand him in good stead in later seeking a better employment position. Working on a political campaign does not render a person unfit for promotion by that fact alone. That such experience may have helped the five volunteers does not discredit the City of Chicago's hiring practices nor does it prove that politics was the motivating factor in the employment decision at issue in this case. Further, there was no evidence

introduced that tended to show that any of the volunteers were not competent Security Specialists.

## CONCLUSIONS OF LAW

In conclusion, the Court finds as follows:

1. The Plaintiffs failed to prove by clear and convincing evidence that their political neutrality during the campaign for mayor was a motivating factor in their removal from their positions as Security Specialists.

2. That Hillard was not motivated by any political factor when he detailed the Emanuel volunteers to Unit 542.

3. That Thompson was not motivated by any political factor when he appointed the Emanuel volunteers to Unit 542.

Accordingly, the Court finds in favor of the City of Chicago and against the Plaintiffs.

**IT IS SO ORDERED.**

                                                                                       _____
                                                                                       Harry D. Leinenweber, Judge
                                                                                       United States District Court

Dated: June 29, 2016